**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | |
|---|---|
| OBIOMA EBISIKE, Individually and On Behalf of All Others Similarly Situated, | ) ) ) ) **Case No.** |
| Plaintiff, | ) ) ) |
| v. | ) ) **JURY TRIAL DEMANDED** |
| HD SUPPLY HOLDINGS, INC., JOSEPH J. DEANGELO and EVAN J. LEVITT, | ) ) ) ) ) |
| Defendants. | ) ) |

**CLASS ACTION COMPLAINT**

Plaintiff Obioma Ebisike ("Plaintiff"), individually and on behalf of all other

persons similarly situated, by his undersigned attorneys, for his complaint against

Defendants, alleges the following based upon personal knowledge as to himself

and his own acts, and information and belief as to all other matters, based upon,

*inter alia*, the investigation conducted by and through his attorneys, which

included, among other things, a review of the Defendants' public documents,

conference calls and announcements made by Defendants, United States Securities

and Exchange Commission ("SEC") filings, wire and press releases published by

and regarding HD Supply Holdings Inc. ("HD Supply" or the "Company"), analysts' reports and advisories about the Company, and information readily obtainable on the Internet.  Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a federal securities class action on behalf of a class consisting of all persons other than Defendants who purchased or otherwise acquired HD Supply securities between November 9, 2016 and June 5, 2017, both dates inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, against the Company and certain of its top officials.

2.      HD Supply is one of the largest industrial distributors in North America. The Company provides a broad range of products and services to approximately 500,000 professional customers in the maintenance, repair and operations, infrastructure and power and specialty construction sectors.

3.     Formerly known as "HDS Investment Holding, Inc.," the Company changed its name to "HD Supply Holdings, Inc." in April 2013.  The Company is headquartered in Atlanta, Georgia, and its stock trades on the NASDAQ stock market ("NASDAQ") under the ticker symbol "HDS."

4.     Throughout the Class Period, Defendants made materially false and misleading statements regarding the Company's business, operational and compliance policies. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) HD Supply's full year 2017 growth and operational leverage targets were unattainable; (ii) the operational recovery of its Facilities Maintenance supply chain was not going according to plan; (iii) the Company was exploring the sale of its Waterworks segment; (iv) HD Supply's CEO Joseph DeAngelo ("DeAngelo"), with full knowledge of the undisclosed materially adverse facts alleged herein, embarked on a selling spree of personal holdings of HD Supply stock that netted him over $54 million in proceeds; and (v) as a result of the foregoing, HD Supply's public statements were materially false and misleading at all relevant times.

5.     In early 2016, HD Supply's Facilities Maintenance ("FM") segment began experiencing a number of supply chain deficiencies. The Company initially failed to properly calculate the demand for its products, leaving it undersupplied in

advance of the 2016 spring and summer selling sessions. When management noticed the Company's product shortfall, it took remedial action to adjust ordering, a decision that led to an unreasonably large buildup of inventory. As a result, HD Supply's distribution centers were stretched beyond capacity during the latter part of 2016.

6.    In November 2016, Defendants began touting that the Facilities Maintenance recovery was on track and that the Company was "perfectly positioned to enter 2017 and deliver on [its] commitments of 300 basis points more than market, one-and-a-half times operating leverage and 75% cash generation." Throughout the Class Period, Defendants continued making similar statements, going so far as to assert that HD Supply's operating leverage would drastically increase in the second half of 2017 due to lower costs in the FM segment.

7.    However, on June 6, 2017, HD Supply reported first quarter 2017 earnings that missed analyst estimates; disclosed the divestiture of one its main business segments, "Waterworks," which is the nation's largest distributor of water, sewer, storm and fire protection products; and announced increased capital investments in its FM segment. Given the sizeable increase in FM investment spending, HD Supply was forced to reduce its operating leverage targets for full year 2017—a widely followed metric in the industrial product supply industry. The

announced increase in FM investment spending caught analysts and investors by surprise, particularly since the Company had stated on multiple occasions that its inventory setbacks were a thing of the past and that substantial investment in technology and operations had already been made by the Company.

8.    As a result of these disclosures, the Company's share price declined $7.24 per share, or 17.5%, from a close of $41.27 per share on June 5, 2017 to a close of $34.03 per share on June 6, 2017—wiping out over $1.4 billion in market capitalization in one day. HD Supply's share price continued trading lower the next day on unusually elevated trading volume, dropping an additional $1.22 per share, or 4%, to $32.81 per share on June 7, 2017—representing a two-day drop of over 20%.

9.    In advance of these disclosures, and over the course of just one week, between March 29, 2017 and April 4, 2017, inclusive, Defendant DeAngelo sold over 1.3 million HD Supply shares for proceeds of nearly $54 million. At the time DeAngelo disposed of his shares, Company insiders were fully aware of this negative information, yet failed to inform investors of the drastic increase in capital investments or the substantial likelihood that one of its main lines of business would be sold. Instead, DeAngelo massively dumped shares at artificially inflated

prices, grossing tens of millions of dollars prior to revealing the truth to the investing public.

10.    As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

11.    The claims asserted herein arise under and pursuant to §§ 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

12.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and Section 27 of the Exchange Act.

13.    Venue is proper in this Judicial District pursuant to § 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b). HD Supply's principal executive offices are located within this Judicial District.

14.    In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

15.    Plaintiff, as set forth in the attached Certification, acquired HD Supply securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

16.    Defendant HD Supply is incorporated in Delaware, with principal executive offices located at 3100 Cumberland Boulevard, Suite 1480, Atlanta, Georgia 30339.   HD Supply's shares trade on the NASDAQ under the ticker symbol "HDS."

17.    Defendant Joseph J. DeAngelo has served as the Company's President and Chief Executive Officer ("CEO") since January 2005 and as Chairman of the Board of Directors since March 12, 2015.

18.    Defendant Evan J. Levitt ("Levitt") served as HD Supply's Senior Vice President, Chief Financial Officer ("CFO"), Chief Administrative Officer and Comptroller during the Class Period.

19.    The Defendants referenced above in ¶¶ 17-18 are sometimes referred to herein as the "Individual Defendants."

## SUBSTANTIVE ALLEGATIONS

### Background

20.    HD Supply is one of the largest industrial distributors in North America. Through its Facilities Maintenance segment, HD Supply offers maintenance, repair, and operations products to the managers and owners of multifamily, hospitality and commercial properties as well as healthcare and government facilities.

21.    HD Supply's Waterworks segment is the nation's largest distributor of water, sewer, storm and fire protection products. Waterworks provides a number of services, from water and sewer line installation, storm water retention systems and water/wastewater treatment plant construction to fire protection equipment and fusible piping.

22.    HD Supply's Construction & Industrial segment provides specialty hardware, tools and materials for medium-to-large contractors, including home improvement products and building materials.

23.    In early 2016, Facilities Maintenance's supply chain began having issues related to the under-ordering of inventory in advance of the 2016 spring and summer selling seasons. Corrective action was taken to adjust ordering in 2016, which resulted in an unusual amount of inventory. As a result, the Company's

distributions center's resources were overstretched, forcing HD Supply to take remedial action to process the inventory in its network and rebalance it throughout the country.

### Materially False and Misleading Statements Issued During the Class Period

24.    The Class Period begins on November 9, 2016, when Defendants DeAngelo and Levitt took part in the Robert W. Baird Global Industrial Conference. During the conference, DeAngelo emphasized that "[o]ur work in Facilities Maintenance on our supply chain is on track. *We're perfectly positioned to enter 2017 and deliver on our commitments of 300 basis points more than market, one and-a-half times operating leverage and 75% cash generation."* When asked about the improvements being made to the FM segment, DeAngelo once again stressed that "we feel very comfortable that coming into next year, we will consistently be able to deliver and every year forward that 300 basis points market outgrowth and at a 1.5 operating leverage."

25.    On December 6, 2016, HD Supply issued a press release entitled "HD Supply Holdings, Inc. Announces Fiscal 2016 Third-Quarter Results," announcing its third quarter 2016 financial results. Immediately following the earnings announcement, HD Supply held an investor conference call to discuss its Q3 2016 financial results. During the conference call, Defendant DeAngelo asserted that the

"operational recovery" of its "Facilities Maintenance supply chain continues to make exciting daily progress, and the teams are executing at or ahead of expectations." DeAngelo also reaffirmed HD Supply's "commitment to generating 300 basis points of sales growth in excess of market and 1.5 times operating leverage for the full year of fiscal 2017." The Company's projected operating leverage framework for fiscal 2017 was as follows:



26.    During the December 6th conference call, Joe Ritchie of Goldman Sachs asked DeAngelo about his confidence going into 2017, particularly with regards to the Facilities Maintenance fulfillment issue. In response, DeAngelo acknowledged that, "in all cases, everything we're seeing is tracking exactly the way we think it should be seen."

27.    On March 14, 2017, HD Supply issued a press release announcing its 2016 full year and fourth quarter financial results. In its press release, the Company

discussed its outlook for fiscal year 2017, stating: "For fiscal year 2017, the company estimates end market growth of approximately 2-3 percent. The company estimates 300 basis points of sales growth in excess of the estimated market growth and operating leverage in the range of 1.5 to 2.0 times for fiscal year 2017."

28.    On that same day, the Company held its Q4 2016 earnings call with analysts and investors. During the call, DeAngelo was asked about the rumored sale of the Company's Waterworks segment, a topic he swiftly deflected:

**David Manthey**

First off, regarding the rumors about Waterworks sale, I'm wondering if you have any comments regarding that possibility or just more generally how you view any other potential portfolio changes over the course of the next several years.

**Joseph J. DeAngelo**

Yeah, we've always had the same speck, David. So all of our businesses needed to be leadership businesses with a clear path to distant number one. So, we meet the criteria of leadership. We think we got the right stack of path to be a very distant number one in all three of our businesses. And we will operate only in North American markets, highly fragmented. So I think we are hitting the speck of where we are. Constantly, as people approach us, we'll always evaluate and approach and we'll see if that creates value for our associates and value for our shareholders. And that's consistent with what we've done over the last 10 years.

29.    During the March 14th conference call, Ryan Merkel sought clarification on the Company's operating leverage target for the year, stating: ***"To hit the midpoint you are going to need operating leverage above 2x for the rest of***

11

*the year . . . But I just wanted to clarify, is this what you are expecting for the second quarter to the fourth quarter, op[erating] leverage above 2 times?"* Defendant Levitt responded that, "[f]or the second quarter, we're expecting a normalized operating leverage, so in the 1.5 to 2 times range." However, in the third and fourth quarters, management expects operating leverage to *"be at or above 2 times."* In a follow-up question, Ryan Merkel inquired whether the pickup in operating leverage is mainly *"a function of the Facilities Maintenance growth starting to pick back up once you get into the selling season and then the costs falling off in FM"* or whether there was anything else to consider. DeAngelo responded: "No. You're exactly right. The pickup in the sales, *the falloff of the costs,* our comparables year-over-year will get easier . . . ." (Emphasis added.)

30.    The statements referenced in ¶¶ 24-29 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operational and compliance policies. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) HD Supply's full year 2017 growth and operational leverage targets were unattainable; (ii) the operational recovery of its Facilities Maintenance supply chain was not going according to plan; (iii) the Company was exploring the sale of its Waterworks segment; (iv) HD

Supply's CEO DeAngelo, with full knowledge of the undisclosed materially adverse facts alleged herein, was about to embark on a selling spree of personal holdings of HD Supply stock that would net him over $54 million in proceeds; and (v) as a result of the foregoing, HD Supply's public statements were materially false and misleading at all relevant times.

## The Truth Begins to Emerge

31.    On June 6, 2017, the Company reported first quarter 2017 earnings per share of $0.63, $0.03 less than analysts' estimates. HD Supply also disclosed a plan to accelerate its investment spending in the FM segment "to extend [its] differentiated service model and focus on providing a customer-centric omnichannel experience." As a result, the Company will be redeploying working capital into the business, lowering its operating leverage below previously forecasted levels. Interestingly, HD Supply lowered its operating leverage targets without divulging any details about the size and extent of the FM investment spending, a decision that worried investors and analysts.

32.    On that same date, HD Supply also announced that it had entered into a definitive agreement to sell its Waterworks business unit, the nation's largest distributor of water, sewer, storm and fire protection products, for $2.5 billion in cash. As a result of the deal, labeled by management as "a transformational

transaction for HD Supply," the Facilities Maintenance segment now represents close to 75% of HD Supply's total adjusted EBITDA, a 20% increase.

33.     These disclosures contradicted recent statements by HD Supply's management on its two previous earnings conference calls. DeAngelo and other members of management had previously and recently insisted that the Company was well positioned for success, particularly because it had already dealt with inventory issues and because it had already invested in technology and streamlining its operations.

34.     On June 6, 2017, pre-market, HD Supply executives held a conference call to discuss its first quarter 2017 financial results. During the conference call, Defendant DeAngelo announced that William Stengel had been tasked with stabilizing and recovering the operational performance of "the facilities maintenance supply chain operation." The Company plans to accomplish this feat through "accelerated expense investment" with the goal of "developing a next-generation customer-centric omni-channel environment for [its] customers."

35.     During the conference call, Evelyn Chow from Goldman Sachs asked management to "enumerate some of the drivers that" caused the Company to lower its operating leverage guidance from "previously anticipated" levels. In response, Defendant Levitt asserted that HD Supply is "seeing pretty significant margin

compression pressures," particularly within Rebar. These pressures are expected to continue "for the balance of the year." William Stengel also highlighted that operating leverage at the FM segment may fall below previously forecasted levels as a result of "the incremental events . . . planned for the business."

36.     Also during the conference call, Ryan Merkel from William Blair asked management to "quantify the increased FM investment," but the Company's response was noncommittal and poorly explained:

**William Stengel**

Ryan, as far as the quantifying the amount of investment; ***the investments that we expect to incur this year is certainly included in the guidance that we've provided. We are going through and refining our vision and strategy with Karenann and so hesitant to give specific amounts on that investment at this point in time but it is a necessary investment in this business as expectations from customers are continuing to evolve and continuing to get more demanding.*** So the level of execution that was satisfactory two or three years ago is no longer good enough and so we intend to lead the charge in this industry in providing the best customer experience in the multi-family industry. And so our investments will enable us to not only maintain share but continue to grow share faster than the market. And we believe that this is an evolution that is occurring in most industries today, if you're standing still, you're falling behind.

(Emphasis added.)

Ryan Merkel then asked Stengel to elaborate further, accentuating: "Maybe just to flush it out a little bit more, can you just give an example of the new customer expectation; I don't know what you're addressing there?" Stengel once again

stonewalled, asserting: "And you know, we need to continue to get better in all dimensions of when we're interacting with customers, how that experience goes, the solutions we offer, the products that we sell to them, it's the whole range of it."

37.    As a result of these disclosures, HD Supply's share price declined $7.24 per share, or 17.5%, from a close of $41.27 per share on June 5, 2017 to a close of $34.03 per share on June 6, 2017. HD Supply's share price continued trading lower the next day on unusually elevated trading volume, dropping an additional $1.22 per share, or 4%, to $32.81 per share on June 7, 2017— representing a two-day drop of over 20%.

38.    Analysts swiftly chastised the Company. On June 7, 2017, Morgan Stanley downgraded HD Supply from Overweight to Equalweight, with analyst Nigel Coe emphasizing that the Company's estimates are "watered down." Coe stressed that the Company will face difficulties outgrowing the underlying multifamily maintenance, repair, and operations market, and expressed skepticism about HD Supply's ability to achieve management's updated 2017 plan.

39.    On that same day, Robert W. Baird downgraded the Company to Neutral from Outperform, citing the disappointing performance of its Facilities Maintenance segment. Drexel Hamilton also downgraded HD Supply from Buy to Hold. RBC Capital Markets criticized management's transparency, asserting that

*"[t]he most troubling development was the new incremental FM spending that was unexpected and frankly poorly explained on the call."* (Emphasis added.)

40.    On June 9, 2017, Deutsche Bank analyst John Inch downgraded HD Supply to Hold, *asserting that management's credibility has now become an "impediment to a sustained higher share price."* (Emphasis added.)  Inch further noted that the Company had lowered profit leverage targets and mentioned a sizeable increase in investment spending at its Facilities Maintenance segment, without providing details and magnitude. "Overall, it is unclear when the new elevated spending might subside, and could instead go on for years," stated Inch.

41.    Due to DeAngelo's desire to dump his shares of HD Supply into the public market, the Company was caused to make false and misleading statements that artificially inflated the price of the shares during the Class Period, and the price at which DeAngelo was able to sell his shares.

42.    On March 6, 2017, DeAngelo began selling a substantial amount of his HD Supply shares. Between March 29 and April 4, 2017, DeAngelo, trading on inside information, disposed of approximately 80% of his shares. At the time, DeAngelo knew that HD Supply's first quarter earnings would be lackluster, the Company's FM segment was facing significant obstacles and in desperate need of a capital injection, and that the Company was divesting its Waterworks business

unit. Retail investors were not privy to this information until June 6, 2017.

DeAngelo's stock sales during the Class Period as are follows:

| Date | Shares | Price | Amount | Type |
|------|--------|-------|--------|------|
| 03/06/17 | 16,785 | $42.60 | $715,023 | Tax Witholding |
| 03/29/17 | 300,000 | $40.39 | $12,115,530 | 10b5(1) |
| 03/30/17 | 300,000 | $41.09 | $12,326,070 | 10b5(1) |
| 03/31/17 | 300,000 | $41.28 | $12,384,390 | 10b5(1) |
| 04/03/17 | 300,000 | $40.52 | $12,156,960 | 10b5(1) |
| 04/04/17 | 112,145 | $40.27 | $4,515,956 | 10b5(1) |
|  | **1,328,930** |  | **$54,213,928** |  |

43.    As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

44.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired HD Supply securities during the Class Period (the "Class") and were damaged upon the revelation of the alleged corrective disclosures. Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate

families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

45.    The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, HD Supply securities were actively traded on the NASDAQ.  While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by HD Supply or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

46.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

47.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.  Plaintiff has no interests antagonistic to or in conflict with those of the Class.

48.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of HD Supply;

- whether the Individual Defendants caused HD Supply to issue false and misleading financial statements during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of HD Supply securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

49.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to

them.  There will be no difficulty in the management of this action as a class action.

50.    Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- HD Supply securities are traded in an efficient market;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NASDAQ and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Plaintiff and members of the Class purchased, acquired and/or sold HD Supply securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

51.    Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

52.    Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute*

*Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## COUNT I

### (Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants)

53.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

54.    This Count is asserted against all Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

55.    During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities.  Such scheme was

intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of HD Supply securities; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire HD Supply securities and options at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

56.    Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for HD Supply securities. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about HD Supply's finances and business prospects.

57.    By virtue of their positions at HD Supply, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other

members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants. Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth. In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

58. Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control. As the senior managers and/or directors of HD Supply, the Individual Defendants had knowledge of the details of HD Supply's internal affairs.

59. The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of HD Supply. As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to HD Supply's businesses, operations, future financial condition and future prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases and

public statements, the market price of HD Supply securities was artificially inflated throughout the Class Period. Unaware of the adverse facts concerning HD Supply's business and financial condition which were concealed by Defendants, Plaintiff and the other members of the Class purchased or otherwise acquired HD Supply securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants, and were damaged thereby.

60. During the Class Period, HD Supply securities were traded on an active and efficient market. Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of HD Supply securities at prices artificially inflated by Defendants' wrongful conduct. Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of HD Supply securities was substantially lower than the prices paid by Plaintiff and the other members of the Class. The market price of HD Supply securities declined

sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

61.     By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

62.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II

**(Violations of Section 20(a) of the Exchange Act Against The Individual Defendants)**

63.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

64.     During the Class Period, the Individual Defendants participated in the operation and management of HD Supply, and conducted and participated, directly and indirectly, in the conduct of HD Supply's business affairs.  Because of their

senior positions, they knew the adverse non-public information about HD Supply's misstatement of income and expenses and false financial statements.

65.     As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to HD Supply's financial condition and results of operations, and to correct promptly any public statements issued by HD Supply which had become materially false or misleading.

66.     Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which HD Supply disseminated in the marketplace during the Class Period concerning HD Supply's results of operations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause HD Supply to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of HD Supply within the meaning of Section 20(a) of the Exchange Act.  In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of HD Supply securities.

67.     Each of the Individual Defendants, therefore, acted as a controlling person of HD Supply.  By reason of their senior management positions and/or

being directors of HD Supply, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, HD Supply to engage in the unlawful acts and conduct complained of herein.     Each of the Individual Defendants exercised control over the general operations of HD Supply and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

68.     By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by HD Supply.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment against Defendants as follows:

A.     Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.     Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.     Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

28

D.     Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Respectfully submitted this 8th day of August, 2017.

/s/ David A. Bain
David A. Bain
Georgia Bar No. 032449
**Law Offices of David A. Bain, LLC**
1230 Peachtree Street, NE
Suite 1050
Atlanta, GA  30309
Tel: (404) 724-9990
Fax: (404) 724-9986
Email: dbain@bain-law.com

**POMERANTZ LLP**
Jeremy A. Lieberman
J. Alexander Hood II
Hui M. Chang
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone:  (212) 661-1100
Facsimile:  (212) 661-8665
Email:  jalieberman@pomlaw.com
        ahood@pomlaw.com
        hchang@pomlaw.com

**POMERANTZ LLP**
Patrick V. Dahlstrom
10 South La Salle Street, Suite 3505
Chicago, Illinois 60603
Telephone:  (312) 377-1181
Facsimile:   (312) 377-1184
Email:  pdahlstrom@pomlaw.com

**BRONSTEIN, GEWIRTZ
& GROSSMAN, LLC**
Peretz Bronstein
60 East 42nd Street, Suite 4600
New York, NY 10165
Telephone: (212) 697-6484
Facsimile (212) 697-7296
Email:  peretz@bgandg.com

*Attorneys for Plaintiff*